**Reversed, Remanded, and Opinion Filed June 21, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00073-CV**

**RICHARD LEE WILLIAMS, P.A., Appellant**
**V.**
**DONNA ROLAND AND DARLENE PENINGER, BOTH INDIVIDUALLY**
**AND AS REPRESENTATIVES ON BEHALF OF THE ESTATE OF MARIE**
**BOLINGER, DECEASED, Appellees**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-08604**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Carlyle
Opinion by Justice Partida-Kipness

Appellant Richard Lee Williams, P.A. appeals the trial court's denial of his

Chapter 74 motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE § 74.351 (expert

report requirements in health care liability actions); TEX. CIV. PRAC. & REM. CODE

§ 51.014(a)(9) (providing for interlocutory appeal of an order denying relief under

section 74.351). We conclude the expert report at issue failed to show the expert was

qualified to provide his opinion as to the standard of care applicable to a physician

assistant such as Williams. As a result, the trial court abused its discretion by denying

the motion to dismiss. The report's deficiency, however, is curable. Accordingly, we

reverse the January 14, 2021 order and remand to the trial court to consider whether to grant a thirty-day extension to cure the report's deficiency and file an amended expert report complying with the requirements of Chapter 74.

## BACKGROUND[1]

The underlying proceeding arose following the death of eighty-eight-year-old Marie Bolinger on November 8, 2019. Bolinger's cause of death was sepsis and pneumonia. At the time of her death, Bolinger had been a resident of Broadmoor Medical Lodge (Broadmoor), a rehabilitation and long-term care facility, since February 2015. According to the expert report[2] of Paul O. Warshawsky, M.D., Bollinger's medical history included dementia, anxiety, falls, muscle weakness, GERD, pneumonia, and other conditions. Bolinger received physical therapy, occupational therapy, speech therapy, and nursing care as a resident of Broadmoor. Monthly orders throughout her residency included oxygen as needed. Beginning in September 2017, her patient plan also included fall-risk protocols. Bolinger suffered multiple falls between April 2019, and her death in November.

Medical records indicate that Bolinger began having trouble breathing on November 7, 2019, or in the early morning hours of November 8, 2019. The time of onset is unclear because her medical records include no nursing documentation

---

[1] We take the following background information from the petition and the expert report in issue, noting that the factual claims have not yet been proven.

[2] References to Bolinger's medical history and the events in the days preceding her death are taken from Dr. Warshawsky's expert report.

–2–

between November 1, 2019, and November 5, 2019, or on November 7, 2019. Angela Ozment, M.D. conducted rounds the morning of November 8, 2019. Dr. Ozment's progress notes[3] indicate Bolinger complained of shortness of breath the night before and during Dr. Ozment's examination. Dr. Ozment noted in the chart that Bolinger "is currently comfortable and in no acute distress." She ordered prescriptions for Levaquin and DuoNeb, which were administered at 11:06 a.m. and 12:28 p.m. respectively. She also ordered a chest x-ray and blood work, both to be conducted "stat." The chest x-ray was done at 1:03 p.m. and showed "bilateral lower lobe consolidation and effusion with suspected CHF/Volume overload." The bloodwork ordered by Dr. Ozment, however, was not obtained.

Williams was a physician assistant at Broadmoor. Annamma Zachariah, R.N. notified Williams of the abnormal chest x-ray results at 5:30 p.m. She did not, however, provide Williams with Bolinger's respiratory assessment, vital signs, O2 saturation levels, or her reaction to the DuoNeb treatment. Williams did not ask for this information, and he made no new orders. Zachariah's notes indicate that she asked Bolinger at 6:35 p.m. if anyone had collected blood from her, and Bolinger said no. Zachariah's notes then state that, at 6:58 p.m., Bolinger was not responding and had no pulse. Zachariah called 911 and when the "team arrived" at 7:10 p.m. Bolinger had expired. Zacariah pronounced Bolinger dead at 7:23 p.m. There is no

---

[3] Dr. Ozment's progress notes were entered by a scribe at 11:55 a.m. and signed by Dr. Ozment on November 24, 2019.

indication in Bolinger's chart that the nursing staff informed Williams that the labs, which had been ordered STAT, had not been done, or that Williams ever inquired about the labs before Bolinger was pronounced dead.

On June 23, 2020, appellees[4] Donna Roland and Darlene Peninger, individually and as representatives of Bolinger's estate, filed the underlying lawsuit against Williams, Zachariah, two entities purportedly doing business as Broadmoor, and Priority Management Group, LLC. Appellees timely-served Williams with Dr. Warshawsky's expert report. Williams filed objections to the expert report on August 19, 2020. Williams argued that the report was insufficient to show causation and Dr. Warshawsky was not qualified to express his opinion as to the standard of care of a physician assistant. In response to the objections, appellees filed a motion to determine the sufficiency of the expert report.

The trial court heard Williams's objections and appellees' motion on October 9, 2020, and took the matter under advisement. On November 10, 2020, the trial court signed an order overruling Williams's objections to the sufficiency of the expert report and finding that the "expert report is in all ways sufficient and in compliance with the statutory requirements of Tex. Civ. Prac. & Rem. Code, Sec. 74.351." On November 30, 2020, more than 120 days after the suit was filed, Williams filed his "Motion for Rehearing on Defendant Richard Lee Williams,

---

[4] Roland and Peninger are Bolinger's biological daughters.

P.A.'s Objections to Plaintiffs' 'Expert Report' of Paul O. Warshawsky, M.D. and Motion to Dismiss, Subject to and Without Waiver of Defendant's Motion to Transfer Venue" (the motion to dismiss). The trial court denied the motion to dismiss by written order on January 14, 2021, and Williams appealed that order.

## JURISDICTION

We must first determine whether we have jurisdiction to consider the merits of this appeal. Jurisdiction is a question of law, which we review de novo. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). Texas appellate courts have jurisdiction to review a trial court's order by appeal if the order constitutes a final judgment or if a statute authorizes an interlocutory appeal. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001); *Stary v. DeBord*, 967 S.W.2d 352, 352–53 (Tex. 1998). Because the trial court's order is not a final judgment, we must determine whether interlocutory appeal is authorized by statute.

Section 74.351 of the civil practice and remedies code requires a health care liability claimant to serve each party with an expert report containing certain information mandated under the statute within 120 days after filing an original petition. TEX. CIV. PRAC. & REM. CODE § 74.351(a). If a health care liability claimant fails to file the required report within 120 days, either because the claimant failed to file any expert report or because the claimant filed an expert report that failed to comply with the statute, a health care defendant may move for (1) an award of attorney's fees and costs incurred by the physician and (2) dismissal of the claims

against the physician with prejudice. TEX. CIV. PRAC. & REM. CODE § 74.351(b)(1), (2); *see Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008) (holding that subsection (b) contemplates dismissal when an expert report is timely filed but inadequate to satisfy statute as well as when no expert report is filed). A defendant is not entitled to dismissal or a fees award under subsection (b), however, until 120 days after the claims against him are filed. *See Lewis*, 253 S.W.3d at 207. TEX. CIV. PRAC. & REM. CODE § 74.351(b), (c). If the claimant filed a timely-but-deficient expert report, the trial court may grant a thirty-day extension of time to cure the deficiencies in the expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(c). The civil practice and remedies code authorizes interlocutory appeals from two types of orders relating to expert reports in health care liability claims: (1) an order on a subsection (b) motion when the trial court denies relief (and does not grant a proper extension of time) and (2) an order on a subsection (l)[5] motion when the trial court grants relief. TEX. CIV. PRAC. & REM. CODE §§ 51.014(a)(9), (10); *Lewis*, 253 S.W.3d at 207.

Here, Williams appeals the trial court's January 14, 2021 order denying the motion to dismiss. Williams filed that motion more than 120 days after appellees filed suit and asked the trial court to dismiss appellees' claims against him with

---

[5] Subsection (l) provides that a trial court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statute's requirements for the content of an expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(l).

prejudice and award him attorney's fees and costs. We conclude the order denying the motion to dismiss is an order that "denies all or part of the relief sought by a motion under Section 74.351(b)" and, therefore, falls under section 51.014(a)(9) of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9); *see also Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 360 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (interpreting order denying request for dismissal pursuant to section 74.351(b) "as a denial of relief sought by a motion under section 74.351(b) for which an interlocutory appeal is available."). We, thus, have jurisdiction over this interlocutory appeal of the trial court's January 14, 2021 denial of the motion to dismiss.

We do not, however, have jurisdiction to review the portion of the motion to dismiss requesting a rehearing of the trial court's November 10, 2020 order because there is not an independent right to an interlocutory appeal of such an order. *See Richter v. Downey*, 565 S.W.3d 847, 852 (Tex. App.—Austin 2018, no pet.) (concluding that order denying motion to reconsider denial of motion to dismiss was not appealable under TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9)) (citing *Central Tex. Spine Inst., LLP v. Brinkley*, 344 S.W.3d 537, 542 (Tex. App.—Austin 2011, pet. denied). We, therefore, limit our review to the arguments asserted by Williams in his November 30, 2020 motion as part of the motion to dismiss portion of that pleading.

**STANDARD OF REVIEW**

"We review a trial court's decision to grant or deny a motion to dismiss based on the adequacy of an expert report for an abuse of discretion." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). "We also review a trial court's determination that an expert witness is qualified under an abuse-of-discretion standard." *Rosemond v. Al-Lahiq*, 362 S.W.3d 830, 833 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing *Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996)).

**APPLICABLE LAW**

Under Chapter 74, claimants in health care liability cases must serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223. The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6).

A report is adequate under the statute if it contains sufficient information to inform the defendant of the specific conduct at issue and provides a basis for the trial court to conclude the claims have merit. *Abshire*, 563 S.W.3d at 223. It "need not

marshal all of the claimant's proof," nor must it meet the same standards as the evidence offered at summary judgment or trial. *Methodist Hosps. of Dallas v. Nieto*, No. 05-18-01073-CV, 2019 WL 6044550, at *7 (Tex. App.—Dallas Nov. 15, 2019, pet. denied) (mem. op.). But it must offer more than an expert's conclusory statements about the standard of care, breach, and damages. *Abshire*, 563 S.W.3d at 223. Thus, "the expert must explain the basis of his statements to link his or her conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

A trial court may grant a motion to dismiss based on the inadequacy of an expert report only "if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statute. TEX. CIV. PRAC. & REM. CODE § 74.351(l). When reviewing a report's adequacy, we consider only the information contained within the four corners of the report. *Abshire*, 563 S.W.3d at 223. Although we "may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended," "we do not abandon common sense" when reviewing these reports. *Id.*

## ANALYSIS

The parties do not dispute that appellees' claims are healthcare liability claims subject to the expert report requirements of Chapter 74. It is also undisputed that appellees timely served Williams with Dr. Warshawsky's expert report. Williams maintains, however, that the expert report failed to meet the requirements of section

–9–

74.351 because (1) the expert report failed to show that Williams's alleged breach of the standard of care proximately caused Bolinger's injury and death, and (2) Dr. Warshawsky was not qualified to opine on the standard of care applicable to a physician assistant. We will address each argument in turn.

## I. Causation

In his first issue, Williams asserts the trial court abused its discretion by denying his Chapter 74 motion to dismiss because the expert report failed to show that Williams's alleged breach of the standard of care proximately caused Bolinger's injury and death. We disagree.

To meet the requirements of Chapter 74 as to causation, the expert must explain "how and why" the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224. A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id.*; *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017). In satisfying this "how and why" requirement, however, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460).

Here, Dr. Warshawsky asserts in his expert report that the standard of care "requires that the physician assistant obtain complete information from the nursing

staff when they receive a call from the nursing staff." He explained that when Zachariah called Williams at 5:30 p.m. and informed him of the abnormal chest x-ray results, Williams should have asked Zachariah for an update on Bolinger's lab results, respiratory assessment, vital signs, O2 saturation levels, and her reaction to the Duo/Neb treatment. According to Dr. Warshawsky, Williams's "failure . . . to elicit this information from the nursing staff was below the standard of care." Dr. Warshawsky further explained the purpose of the labs ordered by Dr. Oxment:

> The labs were ordered to assess a number of things, including but not limited to whether the patient had a high WBC count which would be indicative of sepsis. If the PA had known that the STAT labs ordered by Dr. Ozment had not and could not be done, it is likely that he would have ordered that the patient be transferred to the ER where they could have been done. Had this occurred, her pneumonia would have been properly diagnosed and treated with IV antibiotics.

The expert report discussed in detail the symptoms, route of infection, and treatment of pneumonia and sepsis, as well as the prognosis for patients. Dr. Warshawsky described sepsis as "a medical emergency requiring immediate early intervention in order to reestablish tissue perfusion, oxygenation, and blood pressure levels." When sepsis is left unnoticed and untreated, the chance of death increases. As a result, "[e]arly diagnosis and treatment of the source of the sepsis is critical in preventing the progression of sepsis to severe sepsis and septic shock which are associated with higher mortality rates." Such treatment includes IV antibiotics, O2 therapy, and monitoring. It is Dr. Warshawsky's opinion that Williams's failure to seek complete

information from Zachariah prevented the diagnosis and early treatment of sepsis necessary to prevent Bolinger's death:

> Had PA Williams adhered to the standards of care outlined above, Ms. Bolinger would have been transferred to the hospital at 1730 on 11/8/19 where she would have received the more intensive treatment she needed (IV antibiotics, O2 therapy and monitoring including but not limited to intubation) to treat her pneumonia before it deteriorated into irreversible sepsis. His failures identified above resulted in Ms. Bolinger's death.

We conclude Dr. Warshawsky's explanations provide a straightforward link between Williams's alleged breach of the standard of care and Bolinger's death. That is, the report draws a line directly from Williams's failure to ask for complete information, to a delay in diagnosis and proper treatment (transfer to the ER for blood tests, additional levels of oxygen treatment, and IV antibiotics), to the ultimate injury (pneumonia and sepsis), and death. *See Abshire*, 563 S.W.3d at 225–26 (physician's report adequately linked his conclusion with the underlying facts: failure to properly document Abshire's medical history was a substantial factor in her delayed treatment and subsequent injury).

The cases Williams cites to support his contention that Dr. Warshawsky failed to tie his conclusions to specific facts are distinguishable from this case. *See Jelinek v. Casas*, 328 S.W.3d 526, 530 (Tex. 2010); *see also THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 599, 615 (Tex. App.—El Paso 2016, no pet.); *Jones v. King*, 255 S.W.3d 156, 158 (Tex. App.—San Antonio 2008, pet. denied); *Ngo v. Lewis*, No. 09-10-00140-CV, 2010 WL 3518225, at *1 (Tex. App.—Beaumont Sept. 9,

2010, no pet.). In each of these cases, the reviewing court found the expert report at issue insufficient under Chapter 74 because the report lacked any explanation linking the expert's conclusion to the relevant facts. For example, in *Jelinek*, the report's only discussion of causation consisted of three statements asserting that that the physician's breach of the standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." *Jelinek,* 328 S.W.3d at 539. The court concluded this was conclusory as to causation because the report lacked "any explanation linking the expert's conclusion to the relevant facts." *Id.*

The *Tiscareno* case involved claims against a physician for injuries sustained by a mother and her newborn child before and during delivery. *Tiscareno*, 495 S.W.3d at 604–05. The plaintiffs alleged that while under the physician's care, Tiscareno and her daughter A.R.T. "developed complications related to an infection," the physician "failed to properly monitor, evaluate, and treat those perinatal complications." *Id.* The defendants' expert premised his causation opinion as to A.R.T. "on the conclusion that A.R.T. suffered brain damage from being exposed to chorioamnionitis in utero before and during delivery." *Id.* at 613. He supported this conclusion with general statements that "[c]horioamnionitis is associated with maternal infection, fetal white matter brain injury and cerebral palsy," and that "[t]he longer the baby and the mother were exposed to infection the greater the harm, including infant white matter brain injury and maternal postpartum

–13–

infection." *Id.* at 614. The expert did not, however, expressly state that Tiscareno was suffering from chorioamnionitis at the time of her delivery or that A.R.T. was exposed to chorioamnionitis in utero or for how long that exposure lasted. *Id.* The court concluded that the report was insufficient to meet Chapter 74's requirements as to causation because he made "virtually no attempt, however, to correlate these statements with the facts in this case, . . . ." *Id.* There, as in *Jelinek*, the expert report failed to tie the expert's causation conclusions to the facts of the case. 495 S.W.3d at 613–15.

The *Jones* and *Ngo* cases employed similar reasoning to conclude the report at issue was insufficient under Chapter 74 as to causation. *Jones*, 255 S.W.3d at 158, 161 (report did not adequately address causation because expert did not link medical conclusions with facts of the case); *Ngo*, 2010 WL 3518225, at *3 (expert's conclusion that "the actions and inactions of Dr. Nancy Ngo deviated from the standards of care for Pediatricians and more likely than not proximately caused Ian's irreversible neurological damage and subsequent death" was insufficient to meet Chapter 74's requirements because the report "does not explain how the delays he associates with Dr. Ngo's treatment caused Ian's death.").

Dr. Warshawsky's report does not suffer from such deficiencies. Although his discussion of causation as to Williams is short, it meets the requirements of section 74.351 because the report adequately links his conclusion with the underlying facts (failure to ask for Bollinger's lab results and O2 levels was a substantial factor in

–14–

her delayed treatment and subsequent death). *E.g., Abshire*, 563 S.W.3d at 225–26 ("report adequately links his conclusion with the underlying facts (failure to properly document Abshire's medical history was a substantial factor in her delayed treatment and subsequent injury)."). The report does not have to be persuasive at this stage. *E.D. by & through B.O. v. Tex. Health Care, P.L.L.C.*, No. 20-0657, 2022 WL 1434658, at *3 (Tex. May 6, 2022) ("At this preliminary stage of the litigation, whether the expert's explanations are 'believable' is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort to comply with the Act."); *Puppala v. Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("At this expert-report stage, an expert report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.") (internal quotation omitted); *Keepers v. Blessett*, No. 01-18-01020-CV, 2019 WL 1523368, at *8 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, no pet.) ("That a competing expert might dispute the causal link or the ultimate factfinder might reject the expert's conclusions is immaterial to whether Blessett met her requirements under Section 74.351."). Rather, the report merely had to be a "good faith effort" to comply with the Act. *See E.D.*, 2022 WL 1434658, at *3. We conclude his report met that standard.

Williams's other complaints go to the credibility of Dr. Warshawsky's testimony, not whether the report meets Chapter 74's requirements. For example, Williams takes issue with Dr. Warshawsky's contention that Bolinger could have

–15–

been intubated in the emergency room had she been transferred there at 5:30 p.m. because Bolinger had an Out-of-Hospital Do-Not-Resuscitate Order (OOH-DNR Order) in place. Similarly, Williams argues there is no way to know how the nursing staff would have responded if Williams had requested additional information. Williams also asserts the report is insufficient to address causation because Williams did not explain if Bolinger's disease was treatable and if life-saving treatment could have been given to her in the ninety minutes between Williams's call and Bolinger's death. These complaints go to the credibility of Dr. Warshawsky's opinion, not the sufficiency of the opinion to meet Chapter 74's report requirements, and they do not support dismissal under Chapter 74. *See Abshire*, 563 S.W.3d at 226 ("However, the court's job at this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory."). "At this preliminary stage of the litigation," the believability of an expert's opinion "is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort to comply with the Act." *E.D.* 2022 WL 1434658, at *4; *see, e.g., PIRF Operations, LLC v. Kerr*, No. 05-20-00887-CV, 2021 WL 2801453, at *8 n. 2 (Tex. App.—Dallas July 2, 2021, no pet.) (mem. op.) ("Furthermore, to the extent Accel's argument goes beyond the four corners of Kerr's expert reports and challenges their credibility or the data they may have used, this is not an issue for a Chapter 74 motion to dismiss."); *Tenet Hosps., Ltd. v. Boada*, 304 S.W.3d 528, 542 (Tex. App.—El Paso 2009, pet. denied) ("Whether an expert's

opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74."). Williams's credibility arguments are, thus, unavailing.

We conclude Dr. Warshawsky's report met the requirements of Chapter 74 on the question of causation. His report appropriately informs Williams of the specific conduct Dr. Warshawsky has called into question, provides a sufficient basis for the trial court to conclude that appellees' claims have merit, and demonstrates a good faith effort to comply with the statutory requirements. *See PIRF Operations,* 2021 WL 2801453, at *8; *see also Bidner v. Hill*, 231 S.W.3d 471, 475 (Tex. App.— Dallas 2007, pet. denied). As such, the trial court did not abuse its discretion by denying the motion to dismiss based on its explanation of causation. We overrule Williams's first issue.

## II.    Expert qualifications

In his second issue, Williams argues the trial court abused its discretion by finding Dr. Warshawsky qualified to provide his opinion of the standard of care applicable to a physician assistant like Williams. According to Williams, Dr. Warshawsky is not qualified to give an opinion on the standard of care required of Williams because Williams is a physician assistant and Dr. Warshawsky is a licensed physician. The physician serving as the expert witness, however, need not be a specialist in the particular branch of the profession for which the testimony is offered. *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (neurologist qualified to testify regarding the standard of care of a cardiologist

and ER doctor); *Simpson v. Glenn*, 537 S.W.2d 114, 116–18 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.) (general surgeon qualified to testify regarding the standard of care for post-operative procedures performed by a gynecologist); *Silvas v. Ghiatas*, 954 S.W.2d 50, 54 (Tex. App.—San Antonio 1997, writ denied) (orthopedic surgeon qualified to testify regarding the standard of care for a radiologist). Dr. Warshawsky's profession alone, therefore, does not provide a sufficient basis to disqualify him from testifying to the standard of care applicable to a physician assistant like Williams. Dr. Warshawsky's report, however, is deficient on another basis.

Williams contends the report's failure to specifically mention physician assistants is fatal to the report and requires a finding that Dr. Warshawsky is not qualified as an expert as to Williams' conduct. We agree.

In a suit involving a health care liability claim against a health care provider other than a physician, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care if the person:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

–18–

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b).

Different standards of care apply to physicians and health care providers. *Simonson v. Keppard*, 225 S.W.3d 868, 872 (Tex. App.—Dallas 2007, no pet.). When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *Id.* at 872–74. But if the physician states he is familiar with the standard of care for both physicians and for the specific type of health care provider being sued as to the prevention and treatment of the illness, injury, or condition involved in the claim, then the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for similar health care providers. *See, e.g.*, San *Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (distinguishing *Simonson* and holding report established qualification to provide opinion regarding standard of care applicable to nurse practitioners where physician's report specifically stated, "I am familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers.").

For example, if a physician states he is familiar with the standard of care and responsibilities and requirements for physician assistants, and he has worked with, interacted with, and supervised physician assistants, the physician is qualified to testify on the issue of whether a physician assistant departed from the accepted standards of care for a physician assistant. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 559 (Tex. App.—Dallas 2009, no pet.) (physician qualified where his expert report included specific statement that he had worked with nurses, nurse practitioners, physician assistants, and physicians, including emergency room physicians, and is familiar with the standards of care that apply to such health care providers in similar situations); *see also Cook v. Spears*, 275 S.W.3d 577, 582-84 (Tex. App.—Dallas 2008, no pet.) (orthopedic surgeons' expert reports established surgeons' qualifications to opine on the standard of care of a physician assistant where reports included specific statements concerning experts' familiarity with the practices, procedures, and protocols on the part of a physician assistant).

Here, Dr. Warshawsky states multiple times in his report that he has supervised registered nurses, licensed vocational nurses, and nursing assistants and has knowledge of the standard of care applicable to those health care providers. He further states that he is experienced in treating patients like Bollinger in the assisted living / nursing home context, experience in treating individuals like Bollinger for sepsis and pneumonia, and has knowledge of the standards of care for treating those

conditions. Dr. Warshawsky's report does not, however, include any reference to physician assistants other than preliminary statements that Williams is a physician assistant. Although Dr. Warshawsky is not automatically disqualified from giving an expert opinion regarding the accepted standards of care for a physician assistant such as Williams simply because he is an licensed physician instead of a physician assistant, we may not, through inferences or otherwise, fill in the gaps in his report where he fails to detail why or how he is qualified to offer an opinion about the applicable standard of care for a physician assistant or even expressly state that he is so qualified. *See Concentra Health Services, Inc. v. Everly*, No. 2-08-455-CV, 2010 WL 1267775, at *6 (Tex. App.—Fort Worth Apr. 1, 2010, no pet.) (mem. op.); *see also Cook*, 275 S.W.3d at 582-84.

The expert report does not specifically state that Dr. Warshawsky has knowledge of the standard of care applicable to a physician assistant, nor does it state that he has worked with, interacted with, and supervised physician assistants. Based on those omissions, we conclude the trial court abused its discretion by concluding the report sufficiently showed Dr. Warshawsky was qualified to provide expert testimony concerning the standard of care applicable to a physician assistant like Williams. We hold, therefore, that Dr. Warshawsky did not demonstrate that he is qualified to offer an expert opinion about the standards of care applicable to Williams in this case. As a result, the trial court abused its discretion by determining the report met the requirements of chapter 74 and denying Williams's motion to

dismiss. *See Walker v. Onugha*, No. 05-19-00801-CV, 2020 WL 3248478, at *4 (Tex. App.—Dallas June 16, 2020, no pet.) (mem. op.). We sustain this part of Williams's second issue.

### III. Thirty-day extension of time to cure deficiency

When a court of appeals determines that an expert report deemed sufficient by the trial court is, in fact, deficient, the court of appeals may remand the cause to the trial court for a determination of whether the plaintiff is entitled to a thirty day extension to cure the deficiencies. *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008). A court must grant an extension if a report's deficiencies are curable. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017). The Texas Supreme Court has admonished that courts should be "lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

Williams contends this Court should not remand the case for consideration of an extension but should, instead, render judgment dismissing appellees' claims because Dr. Warshawsky's opinions concerning causation are deficient and incurable. We concluded above, however, that the report was not deficient as to causation. Williams's basis for rendition is, thus, not persuasive. Moreover, although the report is deficient as to Dr. Warshawsky's qualifications to address the standard of care applicable to a physician assistant, the report contained enough information

–22–

to identify the basis of appellees' claims and to implicate Williams's conduct. We cannot say that it would be impossible for the deficiencies in the report to be cured. Under this record, the trial court must be given an opportunity to consider an extension. *Zamarripa*, 526 S.W.3d at 461; *Courtney v. Pennington*, No. 05-16-01124-CV, 2017 WL 3097664, at *4 (Tex. App.—Dallas July 21, 2017, pet. denied) ("The reports at issue are not so deficient as to constitute no report at all, and Pennington is entitled to an opportunity to cure the deficiencies."). Accordingly, we remand the cause to the trial court to consider whether to grant appellees a thirty-day extension within which to file an amended report curing the deficiencies. *See Walker v. Onugha*, No. 05-19-00801-CV, 2020 WL 3248478, at *4 (Tex. App.—Dallas June 16, 2020, no pet.) (mem. op.) (remanding for consideration of whether to grant a thirty-day extension to cure the deficiency); *see also Baylor All Saints Med. Ctr. v. Martin*, 340 S.W.3d 529, 535 (Tex. App.—Fort Worth 2011, no pet.) (same).

## CONCLUSION

Having sustained Williams's second issue, we reverse the trial court's January 14, 2021 order.

We remand this case to the trial court to consider whether to grant appellees a thirty-day extension to cure the report's deficiency and to file an amended expert report complying with the requirements of Chapter 74.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

210073F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

RICHARD LEE WILLIAMS, P.A.,
Appellant

No. 05-21-00073-CV          V.

DONNA ROLAND AND
DARLENE PENINGER, BOTH
INDIVIDUALLY AND AS
REPRESENTATIVES ON BEHALF
OF THE ESTATE OF MARIE
BOLINGER, DECEASE, Appellee

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-20-08604.
Opinion delivered by Justice Partida-
Kipness. Justices Myers and Carlyle
participating.

In accordance with this Court's opinion of this date, the trial court's January 14, 2021 order is **REVERSED** and this cause is **REMANDED** to the trial court to consider whether to grant a thirty-day extension to cure the report's deficiency and file an amended expert report complying with the requirements of Chapter 74..

It is **ORDERED** that appellant RICHARD LEE WILLIAMS, P.A. recover his costs of this appeal from appellee DONNA ROLAND AND DARLENE PENINGER, BOTH INDIVIDUALLY AND AS REPRESENTATIVES ON BEHALF OF THE ESTATE OF MARIE BOLINGER, DECEASE.

Judgment entered this 21st day of June 2022.